IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| ROBERT G. SENESCHAL, *et al.* | : | |
| | : | |
| v. | : | Civil Action No. CCB-08-2171 |
| | : | |
| AM BROADBAND, LLC, *et al.* | : | |
| | : | |

…o0o…

**MEMORANDUM**

Plaintiffs Robert G. Seneschal and Erin C. Redline have filed the present action in response to criminal charges brought against Mr. Seneschal in 2007. The amended complaint alleges malicious prosecution, defamation, and loss of consortium. Now pending before the court are a motion for summary judgment filed by defendants AM Broadband, LLC ("AMB") and Michael Wilson, and a motion to dismiss for lack of personal jurisdiction or, in the alternative, for a more definitive statement, filed by defendants Scott Lochhead, Clifford Sylvestre, David Sylvestre, Edward Reynolds, and Steven Nickel. For the reasons set forth below, the motion for summary judgment will be granted, and the motion to dismiss will be denied as moot.

**BACKGROUND**

AMB is a Florida company with its principal place of business in Connecticut. At all times relevant to this lawsuit, AMB provided design, infrastructure development, and cable-laying and installation services for cable television network operators throughout the United States, including Comcast. AMB is currently inactive.

Mr. Seneschal worked as a project manager at AMB's Anne Arundel County office in Millersville, Maryland from December 2005 until late February 2007; he is married to Ms. Redline. As a project manager Mr. Seneschal oversaw office administration, underground cable-

1

laying work, and installation work inside Comcast customers' homes. At all relevant times, Mr. Wilson was employed by AMB as a mid-Atlantic regional manager; Mr. Lochhead was a managing member of AMB; and Mr. David Sylvestre, Mr. Clifford Sylvestre, Mr. Reynolds, and Mr. Nickel were members of AMB. Mr. Seneschal's direct supervisor was Mr. Wilson.

This case arises out of an investigation into Mr. Seneschal's actions as an AMB employee and his subsequent arrest on June 30, 2007 for violation of two counts of the Maryland Criminal Code, § 7-104, for theft in excess of $500. The arrest occurred at the Baltimore/Washington Thurgood G. Marshall Airport ("BWI") as Mr. Seneschal and Ms. Redline returned from their wedding and honeymoon in Mexico, where they had been with their family and friends from June 24, 2007 to June 30, 2007. Mr. Seneschal was arrested around 2:30 p.m. in front of his wedding party as he got off the airplane. He remained in custody at the airport until the Anne Arundel County police arrived and took him into their custody. After being processed at the Anne Arundel County police station, Mr. Seneschal was released on his own recognizance at approximately 10:30 p.m.

The State's Attorney for Anne Arundel County filed a superseding Criminal Information on August 31, 2007, charging Mr. Seneschal with one count of theft of United States currency from AMB in value of $500 or greater. Subsequently, on October 19, 2007, Assistant State's Attorney Michael Cogan terminated the prosecution of Mr. Seneschal and entered a *nolle prosequi* on the charges. He determined that he could not prove loss to AMB beyond a reasonable doubt. (*See* Cogan Dep. at 63: 16 – 64: 12, April 10, 2009.)

The circumstances leading up to Mr. Seneschal's arrest are summarized below. Sometime in January 2006, while still a project manager at AMB, Mr. Seneschal began "moonlighting" by working for Michael Powell, one of AMB's subcontractors, doing

"underground work," which consists of connecting the cable from the street to the outside of a customer's home by digging a trench, boring a sidewalk or driveway, or a combination thereof. According to Mr. Seneschal, each morning he or his assistant, Linda Greenlee, went to Comcast to pick up work orders for both underground work and installation work. (Seneschal Dep. at 120: 4-8, March 26, 2009.) Mr. Seneschal would then distribute the orders to the AMB crews and subcontractors, such as Mr. Powell. (*See id*. at 121: 3-16.) But Mr. Seneschal would retain some of Mr. Powell's underground work assignments for himself to do in the evenings and weekends after completing his work as a project manager at AMB. (*Id*. at 157: 9-18.) He would then complete the work orders and process the invoices in accordance with standard business practices. At the end of the week he would include the work orders for the work he performed in the weekly production sheet for Mr. Powell. (*See id*. at 158: 3-6.) When Mr. Powell received his check from AMB, he would cash the check in order to pay his crew and Mr. Seneschal. Mr. Powell paid Mr. Seneschal in cash and issued IRS 1099 forms to him. (*Id*. at 162: 5-15.) No one at AMB was made aware of Mr. Seneschal's moonlighting arrangement with Mr. Powell. (*Id*. at 163: 14-17.) Mr. Seneschal testified that by moonlighting in this way he earned around $38,000 in 2006 and around $10,000 or $12,000 in 2007. (*Id*. at 162: 18-19.)

In early 2007, AMB stopped receiving underground work from Comcast, and on February 27, 2007, AMB terminated Mr. Seneschal's services because of a lack of work in Maryland. AMB offered Mr. Seneschal a position in Florida, but he declined. (*Id*. at 138: 3-11.) According to Mr. Wilson, a few weeks after Mr. Seneschal left AMB, a discrepancy between Mr. Powell's invoices and his paychecks was brought to his attention by Ms. Greenlee, who appears to have taken over billing duties at AMB after Mr. Seneschal's departure. (Wilson Dep. at 79: 10-21, March 27, 2009; Dutton Dep. Ex. 5 at 2, April 2, 2009.) When AMB would submit

invoices to Comcast, it would also submit a duplicate copy of the corresponding work. Mr. Wilson testified that two invoices, dated February 3, 2007 and February 9, 2007, which were left by Mr. Seneschal on Ms. Greenlee's desk, did not match the underlying work orders completed by Mr. Powell. (Wilson Dep. at 80: 1-7; 81: 9-12; Dutton Dep. Ex. 5 at 2.) In other words, according to Mr. Wilson, items appeared on the total invoice sent to Comcast that did not appear on the underlying work orders completed by Mr. Powell. (*See* Wilson Dep. at 85: 17-20.) Ms. Greenlee testified that she did not remember bringing these invoices to Mr. Wilson's attention. (Greenlee Dep. at 130, April 3, 2009.)

There is evidence that Greg Mott, director of installation at Comcast, had complained to AMB about its billing practices in the past. (*See* Mott Dep. at 135-36, May 14, 2009; Wilson Dep. at 60: 14-15.) Specifically, Mr. Mott testified that "I shared with them many times my feeling that, questioning Robert [Seneschal's] integrity, you can see by many of these invoices that they were adjusted many times by significant amounts . . . naturally, when you are constantly having to adjust invoices and give the same explanation as to why you are adjusting it to the same person, you start to question whether or not they are just continuing to try to get away with something." (Mott Dep. at 135.) But he also testified that he did not think Comcast was overpaying. (*Id*. at 136.) In addition, Mr. Wilson testified that Mr. Mott had previously complained that once when Mr. Seneschal had been given access to Comcast's documentation to straighten out some confusion about AMB's billing, he had altered the date ranges on Comcast's documentation. (Wilson Dep. at 62: 19 – 63: 8.) Mr. Seneschal denied knowing about any such complaints. (Seneschal Dep. at 161: 3-8.)

Mr. Wilson informed Mr. Lochhead of the discrepancy between Mr. Powell's invoices and those created by Mr. Seneschal to be sent to Comcast, and, at Mr. Lochhead's instruction,

4

commenced an inquiry into Mr. Powell's invoices for previous weeks, during which he found that other invoices did not match the underlying work orders. (Wilson Dep. at 87: 12 – 88: 5.) Mr. Wilson testified that "[a]pproximately $64,000 went into Mr. Powell's pocket that he did not bill for." (*Id*. at 112:16-17.) Sometime in March 2007, Mr. Wilson met with Mr. Powell, who explained that for the past year he had been paying Mr. Seneschal at the end of the week for whatever amount Mr. Seneschal said he was owed. (*Id*. at 101: 3-10.) Mr. Wilson testified that Mr. Powell said he never saw the work being done by Mr. Seneschal, but rather just gave Mr. Seneschal whatever money he said he was owed (*id*. at 104: 1-6); Mr. Powell's testimony confirmed this. (Powell Dep. at 70: 2-16, April 4, 2009.) Thus, it appeared to AMB that Mr. Seneschal had billed it for work for which there was no proof he had ever performed.

According to Mr. Wilson, Mr. Powell also volunteered information that he had used AMB's corporate credit account at a store called Ditch Witch to fix his equipment, and then gave Mr. Seneschal cash for the repairs. (Wilson Dep. at 101: 12-15.) Mr. Powell apparently told Mr. Wilson that he had issued Mr. Seneschal 1099s for all of the monies he paid him, except for cash he gave him after using the Ditch Witch account. (*Id*. at 102: 19 – 103: 6.) According to AMB, Mr. Seneschal never submitted any monies to AMB to offset Mr. Powell's use of the Ditch Witch account. (*See id*. at 103: 15-19.)

Mr. Wilson then reported his findings to Mr. Lochhead, who spoke with James Matour, corporate counsel for AMB. Mr. Matour advised him to contact the authorities, and so Mr. Lochhead instructed Mr. Wilson to call the Anne Arundel police. Mr. Wilson did so before determining whether the extra work had in fact been done because AMB did not have work orders for the extra work, and so could not conclude whether it had been done or that it ever existed. (*Id*. at 107: 17-21.) According to Ms. Greenlee and Mr. Seneschal, the Anne Arundel

County office of AMB maintained copies of work orders in the warehouse behind the office, as well as scanned copies of invoices and work orders on an AMB computer.[1] (*See* Greenlee Dep. at 37 & 40; Seneschal Aff. ¶ 10.) Mr. Wilson also testified that copies of the work orders were stored locally, rather than sent to the corporate office. (Wilson Dep. at 24: 17-19.) Mr. Wilson and Mr. Lochhead testified, however, that they could not find copies of the specific work orders for the work that Mr. Seneschal supposedly did for Mr. Powell. (*Id*. at 107: 17-21; Lochhead Dep. at 108: 10-12, March 30, 2009.) They testified that there were no relevant records in the AMB building. (Wilson Dep. at 107: 21 – 108: 1; Lochhead Dep. at 108: 10-12.)

As a result, at some point during the investigation, after AMB had contacted the police, AMB supposedly contacted Comcast to request copies of the corresponding work orders. Mr. Wilson testified that he contacted Laura Pehlke at Comcast, but that Ms. Pehlke refused to give AMB copies because on a previous occasion when Comcast had allowed Mr. Seneschal into their documentation room he had re-ordered things, so AMB would not be allowed access any longer. (Wilson Dep. at 114: 5-19.) According to Mr. Wilson, at no point was he able to determine any of the addresses at which Mr. Seneschal had supposedly performed work. (*Id*. at 118: 13-18.)

At Mr. Lochhead's direction, Mr. Wilson spoke with Officer Horne of the Anne Arundel County Police on or around March 16, 2007, who referred him to Detective Dutton. Mr. Wilson spoke with Detective Dutton on or around March 22, 2007 and again on May 22, 2007. Then they met on May 29, 2007, at which point Mr. Wilson gave Detective Dutton the relevant documents in AMB's possession. They also met on June 13, 2007, when Mr. Wilson gave

---

[1] Hard copies of the work orders and the corresponding invoices appear to have been kept separately. (*See* Seneschal Dep. at 152: 8-17.) The invoices were kept in a binder by Ms. Greenlee. (*See id*. at 152: 14-17.) It is somewhat unclear whether scanned copies of the work orders and invoices were kept on CDs or on a hard drive. (*See id*. at 281: 20 – 282: 1; Greenlee Dep. at 40-41.)

Detective Dutton a signed written statement. According to Detective Dutton, Mr. Wilson gave him, in addition to other documents, a spreadsheet that he had created which outlined the discrepancies between the handwritten invoices from Mr. Powell and the typed sheets that Mr. Seneschal created and submitted to AMB. (Dutton Dep. at 21: 6-19 & Ex. 4.) Mr. Wilson also gave Detective Dutton the underlying invoice documents.

Detective Dutton interviewed Mr. Powell once as well. According to Detective Dutton, Mr. Powell told him that he never had checked to see whether Mr. Seneschal's alleged work had been completed. (*Id*. at 64: 15-18.) As a result, testified Detective Dutton, "there was no evidence that Mr. Seneschal actually did any work." (*Id*. at 64: 18-19.) Detective Dutton's police report indicated that after looking at Mr. Powell's handwritten invoices and AMB's weekly invoices created by Mr. Seneschal, "I could see discrepancies on every invoice submitted by Mr. Seneschal." (*Id*. Ex. 9 at 3.) Detective Dutton tried to contact Mr. Seneschal by phone twice, but never received a call back after leaving him voicemails. (*See id*. at 41: 20 – 42: 8.) He also testified that he tried contacting John Kern at Comcast because he wanted to get addresses that Comcast had given to AMB for its contracting services, but that Comcast would not cooperate in the investigation. (*Id*. at 60: 13-61: 16.) He did not contact anyone else at Comcast. (*Id*. at 62: 7-9.) Detective Dutton eventually determined that probable cause existed for Mr. Seneschal's arrest, and he signed an application for statement of charges on June 25, 2007. (*See id*. Ex. 10.) Based on the application, a commissioner (signed off on the arrest that same day and) issued an arrest warrant the same day. (*See id*. Ex. 11.) A few days later, on June 30, Mr. Seneschal was arrested at BWI.

Assistant State's Attorney Cogan later determined that loss to AMB could not be shown beyond a reasonable doubt and dropped the charges against Mr. Seneschal. He testified that he

7

made this determination on the basis of his conversations with Mr. Wilson and Mr. Mott. Specifically, Mr. Mott explained that it would be very difficult for a contractor or subcontractor to submit phony work orders because Comcast verifies everything before issuing payment. (*See* Cogan Dep. at 61: 3-21.) Mr. Cogan determined that he could not prove loss beyond a reasonable doubt and so decided not to prosecute. (*Id*. at 64: 11-12.)

As a result of these events, Mr. Seneschal has sued the defendants for malicious prosecution and defamation (Counts I and II), and, together with Ms. Redline, for loss of consortium (Count III). Defendants AMB and Mr. Wilson have moved for summary judgment on all three claims. The remaining defendants have moved to dismiss for lack of personal jurisdiction or, in the alternative, for a more definite statement pursuant to Federal Rule of Civil Procedure 12(e). The court finds that the defendants are entitled to summary judgment on all claims.

## ANALYSIS

*I.    Standard of Review*

Federal Rule of Civil Procedure 56(c) provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). Whether a fact is material depends upon the substantive law. *See id.*

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion,'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alteration in original) (quoting *United States v. Diebold*, 369 U.S. 654, 655 (1962)), but the court also must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993) (internal quotation marks omitted).

## II. *Malicious Prosecution*

It is well-settled in Maryland that "suits for malicious prosecution are viewed with disfavor in law and are to be carefully guarded against." *One Thousand Fleet Ltd. P'ship v. Guerriero*, 694 A.2d 952, 955 (Md. 1997) (internal quotation marks and citation omitted). This is because "Public policy requires that citizens be free to resort to the courts to resolve grievances without fear that their opponent will retaliate with a malicious use of process lawsuit against them." *Id.* at 955-56.

The tort of malicious prosecution has four elements: "(a) a criminal proceeding instituted or continued by the defendant against the plaintiff, (b) termination of the proceeding in favor of the accused, (c) absence of probable cause for the proceeding, and (d) 'malice', or a primary purpose in instituting the proceeding other than that of bringing an offender to justice." *Montgomery Ward v. Wilson*, 664 A.2d 916, 922 (Md. 1995) (internal quotation marks omitted) (quoting *Exxon Corp. v. Kelly*, 381 A.2d 1146, 1149 (Md. 1978)). The defendants argue Mr.

Seneschal has shown only the second of four elements, termination in his favor. Even assuming without deciding that the defendants instituted the criminal proceeding against Mr. Seneschal, however, the defendants have shown as a matter of law that there was probable cause and no malice. Accordingly, the defendants are entitled to summary judgment on Mr. Seneschal's malicious prosecution claim.

  *A.*  *Probable Cause*

  The burden is on the plaintiff in a malicious prosecution case to show that the defendant lacked probable cause. *Smithfield Packing Co., Inc. v. Evely*, 905 A.2d 845, 860 (Md. App. 2006). Probable cause is defined as "a reasonable ground of suspicion supported by circumstances sufficiently strong in themselves to warrant a cautious man in believing that the accused is guilty", *id*. (internal quotation marks omitted) (quoting *Gladding Chevrolet, Inc. v. Fowler*, 287 A.2d 280 (Md. 1972)), and it is "determined by the facts known at the time the prosecution was instituted." *Silvera v. Home Depot U.S.A., Inc.*, 189 F. Supp. 2d 304, 310 (D. Md. 2002) (citing *Banks v. Montgomery Ward & Co.*, 128 A.2d 600, 604-05 (Md. 1957)). If the facts are undisputed with respect to probable cause, then the question of probable cause is one for the court. *Id*. (citing *Fowler*, 287 A.2d at 284).

  The inquiry here is whether the circumstances warranted reasonable people in the defendants' positions to believe in good faith that Mr. Seneschal was involved in a crime. *Nasim v. Tandy Corp.*, 726 F. Supp. 1021, 1027 (D. Md. 1989). In certain circumstances, there may be a duty to investigate, *Laws v. Thompson*, 554 A.2d 1264, 1272 (Md. App. 1989), because the test for probable cause extends to any knowledge "which could or ought to have been gained by a reasonable person." *K-Mart Corp. v. Salmon*, 547 A.2d 1069, 1074 (Md. App. 1988), *overruled on other grounds by Wilson*, 664 A.2d 916. Moreover, "once a person undertakes a duty to

investigate and supply police with information, he has a duty to furnish the police with exculpatory as well as inculpatory information." *Laws*, 554 A.2d at 1272. But "the failure to pursue potentially exculpatory leads, in itself, is not sufficient to negate probable cause." *Villeda v. Prince George's Cnty.*, 219 F. Supp. 2d 696, 701 (D. Md. 2002) (citing *Clipper v. Takoma Park*, 876 F.2d 17, 20 (4th Cir. 1989)); *see also Reaves v. Westinghouse Elec. Corp.*, 683 F. Supp. 521, 524 (D. Md. 1988) (holding that once evidence established a threshold of probable cause, the defendant "was under no obligation to conduct further investigation to negate possible explanation of [the plaintiff's] actions").

Furthermore, it is a good, and possibly complete, defense to the charge of lack of probable cause that the defendant "placed the facts fully and fairly before his counsel and acted upon his advice." *Fowler*, 287 A.2d at 284 (internal citation omitted). But "a civil defendant may not avoid liability for malicious prosecution by relying on the independent judgment of a prosecutor or attorney unless that defendant has made a full disclosure of all material facts relative to the charges being made." *Laws*, 554 A.2d at 1273 (internal quotation marks omitted) (quoting *Brown v. Dart Drug Corp.*, 551 A.2d 132 (Md. App. 1989)).

It is undisputed that both Detective Dutton and a commissioner determined there was probable cause in this case following Detective Dutton's investigation. Moreover, it is undisputed that Mr. Lochhead sought the advice of Mr. Matour, AMB's attorney, before advising Mr. Wilson to go to the authorities. Mr. Seneschal argues, however, that the defendants nevertheless lacked probable cause because they failed to furnish the police with all exculpatory information. Specifically, he contends that the evidence shows that Mr. Wilson and those at AMB's corporate headquarters had access to hard and digital copies of the AMB invoices to Comcast and the underlying work orders, which would have verified whether Mr. Seneschal had

11

done the work in question. He also argues that the defendants made material misrepresentations to the police by representing that over $60,000 was missing since January 1, 2006, and that there was an internal audit performed. Moreover, Mr. Seneschal alleges that misrepresentations were made to Mr. Matour when Mr. Lochhead supposedly told him that Comcast had contacted AMB to dispute some of its billing. Finally, Mr. Seneschal argues that it was affirmatively represented to the police and Mr. Matour that Mr. Seneschal had not done the work in question.

The undisputed facts in this case, however, show that the evidence before Mr. Wilson and AMB established a threshold of probable cause. First, it is undisputed that no one at AMB knew of the special arrangement between Mr. Seneschal and Mr. Powell prior to Mr. Wilson's conversation with Mr. Powell in March 2007. Second, it is undisputed that the work completed by Mr. Powell was significantly less than the work claimed on the invoices created by Mr. Seneschal. Although there is some dispute as to how Mr. Wilson was made aware of this discrepancy, that is not material as it is undisputed that the discrepancy existed. Next, it is undisputed that Mr. Powell never saw the work orders completed by Mr. Seneschal, nor did he take efforts to confirm that Mr. Seneschal had, in fact, performed the work for which he was paid. Last, although Mr. Seneschal contends that AMB had access to past work orders and, therefore, the ability to verify whether the work in question had been completed, there is no evidence that anyone at AMB was able to find the particular work orders completed by Mr. Seneschal, or was able to verify Mr. Seneschal's work by any other means. Rather, the only testimony in the record shows that Mr. Wilson looked for the work orders in question but could not find them. There is also evidence that he unsuccessfully tried to contact Comcast in order to obtain the disputed work orders. Even drawing all inferences in favor of Mr. Seneschal, it cannot be inferred from the fact that Mr. Seneschal and Ms. Greenlee tended to keep copies of

completed work orders that Mr. Wilson necessarily could find during his investigation the specific orders for work accomplished by Mr. Seneschal. In fact, the disputed work orders have not been found to date.

On their own, these undisputed facts were sufficient to cause a reasonable person to believe that Mr. Seneschal was involved in criminal activity by accepting payment for work that it did not appear he had actually performed.[2] *See Silvera*, 189 F. Supp. 2d at 310 (holding that the undisputed facts justified a reasonable belief that the plaintiff was guilty and "constitute[d] probable cause without reference to the contested statements" of two witnesses). Moreover, it is clear from the proffered evidence that the defendants acted reasonably by investigating the matter. Mr. Wilson examined the records in question and relayed his findings to Mr. Lochhead. Mr. Wilson then spoke to Mr. Powell, who had no ability to confirm that Mr. Seneschal had done the work he said he had. According to Mr. Wilson's testimony, he looked for the underlying work orders, but could not find them or otherwise verify the addresses at which Mr. Seneschal supposedly did the work. Eventually Mr. Lochhead contacted Mr. Matour, who advised AMB to contact the police. Only then did Mr. Wilson discuss the situation with Officer Horne and Detective Dutton. Thus, this is not a case where the defendant made a rash or malicious decision to contact the authorities before inquiring into suspicious activity. Rather, before contacting the police, AMB investigated the matter for over a week and sought the advice of counsel. This was reasonable conduct.

Furthermore, it cannot be inferred that the defendants failed to notify the police of exculpatory information. It has not been alleged that anyone at AMB actually saw orders that

---

[2] The court notes that, at the time of his investigation, Mr. Wilson also was presented with evidence from Mr. Powell that he had used the Ditch Witch credit account and paid Mr. Seneschal in cash, as well as past complaints from Comcast about Mr. Seneschal's integrity with regard to billing.

13

would have verified Mr. Seneschal's work, and the defendants were not required to investigate all possible exculpatory leads. *See Villeda*, 219 F. Supp. 2d at 701. Moreover, it is apparent from the record that Mr. Wilson told Detective Dutton about the arrangement between Mr. Seneschal and Mr. Powell, as well as how the billing and invoicing process worked. (*See* Dutton Dep. Ex. 9.) Although Detective Dutton testified that he did not recall Mr. Wilson ever telling him that AMB had copies of past work orders (*see* Dutton Dep. at 80: 11-15), Detective Dutton's police report indicates that he understood the mechanics of the billing process and that work orders were involved. (*See id*. Ex. 9.) Mr. Wilson's June 13, 2007 written statement to the police also described that "[i]n researching the 'overpaid' items the company found that no work orders existed for the items that were paid to the subcontractor Mike Powell above what was listed on his invoices and back up dailies", and "[t]here is to our knowledge no evidence of any work orders issued to Rob Seneschal or Mike Powell other than the work orders billed to the company by Mike Powell on his weekly invoices." (Dutton Dep. Ex. 5 at 2.) This statement is consistent with all the testimony in this case: Mr. Seneschal's work orders could not be, and never have been, found. In addition, Detective Dutton contacted Comcast to get addresses for the work it contracted out to AMB, but was unsuccessful. (*Id*. at 61: 5-8.) Thus, it is evident that Detective Dutton was aware that exculpatory information might have existed, and attempted to obtain it.

Likewise, it cannot be inferred that the defendants affirmatively misrepresented any material facts to the police or Mr. Matour. First, contrary to what Mr. Seneschal argues, there is no evidence that Mr. Wilson told Officer Horne or Detective Dutton that AMB was missing $60,000 since January 1, 2006. Rather, Officer Horne's police report explained only that "Wilson stated that he was early on in this internal investigation and he believes that the theft

14

amount is somewhere between $40,000 and $100,000 in lost [sic]." (Dutton Dep. Ex. 8 at 2.) This is hardly a conclusive statement that the company was missing $60,000. Similarly, Detective Dutton's report and statement of charges stated only his personal observation based on Mr. Wilson's spreadsheet comparing the invoices that "[f]rom 1/06 to 3/07 the difference in the weekly invoices added up to $64,960.00" (*id*. Ex. 9 at 3; *id*. Ex. 10 at 3); and Mr. Wilson's written statement explained that "it *appears* more than $60,000 was funneled through this scheme." (*Id*. Ex. 5 at 2 (emphasis added).) Nowhere in his report or statement of charges did Detective Dutton state that Mr. Wilson told him AMB was, in fact, missing money.

In addition, Mr. Seneschal's argument that Mr. Wilson falsely told Officer Horne that an audit had been performed misconstrues the evidence. The first evidence of Mr. Wilson's statement to Officer Horne appears in Officer's Horne's report, which stated that Mr. Wilson had "conducted a preliminary audit of the records." (*Id*. Ex. 8 at 2.) "Audit" may not have been the most precise word to describe Mr. Wilson's investigation, but the meaning of the statement is clear: Mr. Wilson conducted a preliminary examination of the records showing a discrepancy between the invoices submitted by Mr. Powell and those created by Mr. Seneschal. That he did so is undisputed, and thus, no material misrepresentation was made in this regard. Moreover, there is no evidence that Mr. Wilson told the police he was certain Mr. Seneschal had not done the work. Rather, the police reports and Mr. Wilson's written statement focus on the discrepancies between the invoices, and Mr. Powell's inability to confirm that the work was completed. (*See id*. Exs. 5, 8, 9, 10.)

Finally, although Mr. Matour testified that he recalled Mr. Lochhead telling him that Comcast had contacted AMB to dispute some bills, leading to an investigation into Mr. Seneschal and Mr. Powell's relationship (*see* Matour Dep. at 18: 1-13, April 1, 2009), even if a

15

misrepresentation occurred,[3] it is not material, as it is evident that Mr. Matour was aware AMB already had looked into the invoices submitted by Mr. Powell and had determined there was, in fact, a discrepancy. (*See id*.) Moreover, Mr. Matour testified that based on what Mr. Lochhead told him, he concluded "it *appeared* to be just a situation where Seneschal was essentially, you know, stealing money." (*Id*. at 19: 7-10 (emphasis added).) When asked whether "stealing money" was Mr. Lochhead's phrase, Mr. Matour answered "No. No, that's my paraphrase, that's not Mr. Lochhead's words." (*Id*. at 19: 12-16.) Thus, the impetus for the internal investigation was not material to Mr. Matour's advice, as he understood that a discrepancy existed between the invoices, but that nothing was conclusive. Furthermore, Mr. Seneschal has pointed to no testimony or other evidence showing that it was affirmatively represented to Mr. Matour that Mr. Seneschal positively had not performed the work in question.

For the aforementioned reasons, the undisputed facts show that probable cause existed as a matter of law. The defendants sought, and acted upon, the advice of counsel, and thereafter made a full disclosure to the police, who, based on an independent investigation, determined there was probable cause to arrest Mr. Seneschal. The defendants, therefore, cannot be liable for malicious prosecution, and are entitled to summary judgment on Count I.

  *B.*  *Malice*

Mr. Seneschal also has failed to present evidence of malice sufficient to survive the defendants' motion for summary judgment. The element of malice requires a showing of a "wrongful or improper motive in initiating legal proceedings against the plaintiff." *Wilson*, 664 A.2d at 924. An improper motive "does not require evidence of spite, hatred, personal enmity or a desire for revenge." *Id*. at 925 (internal quotation marks and citation omitted). But "[m]ere

---

[3]   The court notes that there is evidence in the record that Comcast complained of AMB's billing practices, and specifically those of Mr. Seneschal, in the past.

16

negligence in instituting unjustified criminal proceedings against the plaintiff cannot satisfy the 'malice' element" of a malicious prosecution claim, *id*. although malice may be inferred from a lack of probable cause. *Id*.

Mr. Seneschal argues that the defendants were improperly motivated by filing an insurance claim for AMB's potential loss. The record, however, does not contain sufficient evidence of such a motive to create a triable issue of material fact. It is not reasonable to infer that simply because a company filed an insurance claim when faced with evidence of a possible theft, an insurance payout was the motivation for contacting the police. Mr. Matour testified that upon hearing of the matter from Mr. Lochhead, his first piece of advice was to check whether AMB had insurance for employee theft, and that Mr. Lochhead had not inquired yet whether it did. (*See* Matour Dep. at 22: 15-24.) This evidence indicates that AMB's investigation began before Mr. Lochhead was aware the company's insurance might cover a loss. Moreover, that the insurance company ultimately may have determined no loss had been shown does not lead to an inference of malice. Accordingly, the defendants' motion for summary judgment will be granted as to Count I.

III.    *Defamation*

Mr. Seneschal alleges the defendants made defamatory statements about him when they told the police and "other AM Broadband/Nexlink employees" that Mr. Seneschal had embezzled money. (Am. Compl. ¶ 11.) To recover for defamation under Maryland law, a plaintiff must establish that: "(1) the defendant made a defamatory statement regarding the plaintiff to a third person; (2) the statement was false; (3) the defendant was legally at fault in making the statement; and (4) the plaintiff suffered harm thereby." *S. Volkswagen, Inc. v.*

17

*Centrix Fin., LLC*, 357 F. Supp. 2d 837, 843 (D. Md. 2005) (internal quotation marks and citation omitted).

Maryland recognizes a qualified privilege in defamation cases where an individual "publishes a statement in good faith in furtherance of . . . interests shared with others." *Mareck v. Johns Hopkins Univ.*, 482 A.2d 17, 21 (Md. App. 1984); *see also Sindorf v. Jacron Sales Co., Inc.*, 341 A.2d 856, 865 (Md. App. 1975) (explaining that the defense of privilege rests on the idea that "the defendant is acting in furtherance of some interest of social importance" which "may be one of the defendant himself, of a third person, or of the general public"). Maryland courts have recognized such a privilege in the employee-employer relationship. *See Happy 40, Inc. v. Miller*, 491 A.2d 1210, 1214 (Md. App. 1985) (listing cases); *see also Sindorf*, 341 A.2d at 866 (explaining a conditional privilege exists where an employer gives a character of an employee, whether voluntarily or upon request). This includes "statements accusing employees or former employees of theft." *Kairys v. Douglas Stereo Inc.*, 577 A.2d 386, 391 (Md. App. 1990) (internal citation omitted), *overruled on other grounds by Wilson*, 664 A.2d 916.[4]

Unlike absolute privileges, qualified privileges may be lost when:

> (1) the publication is made with malice, that is, with knowledge of falsity or reckless disregard for truth . . .; (2) the statement was not made in furtherance of the interest for which the privilege exists; (3) the statement is made to a third person other than one whose hearing is reasonably believed to be necessary or useful to the protection of the interest; and (4) the statement includes defamatory matter not reasonably believed to be in line with the purpose for which the privilege was granted.

*Mareck*, 482 A.2d at 21 (internal quotation marks and citations omitted). It is the plaintiff's burden to overcome the privilege. *Sindorf*, 341 A.2d at 867. Whether a statement is privileged

---

[4] *Kairys* was cited approvingly for this proposition in *Caldor, Inc. v. Bowden*, 625 A.2d 959, 970 (Md. 1993). In *Caldor*, the Maryland Court of Appeals declined to adopt an absolute privilege for communications made to the police. *See* 625 A.2d at 969. But the court assumed without deciding that such statements were entitled to a qualified privilege. *Id*.

is a question for the court, unless the facts are in dispute. *Id*. at 865. Whether the plaintiff has overcome a qualified privilege by showing malice is a jury question, unless only one conclusion can be inferred from the evidence. *Id*. at 867.

Mr. Seneschal argues that any qualified privilege in this case is destroyed because Mr. Wilson's statements to the police and his colleagues at AMB about Mr. Seneschal's possible theft were made with knowledge of falsity or, in the alternative, with reckless disregard for the truth. The court disagrees. As a preliminary matter, the record contains no evidence that Mr. Wilson, or anyone else at AMB, *knew* Mr. Seneschal had performed the work at issue, nor is there any other evidence demonstrating knowledge that Mr. Seneschal was innocent of any wrongdoing. *See Kairys*, 577 A.2d at 392 (holding no actual knowledge existed where defendant employer accused employee of theft based almost exclusively on polygraph results because "there was a good bit of information casting suspicion on [the plaintiff].").

Furthermore, it cannot reasonably be inferred that Mr. Wilson acted with reckless disregard for the truth when he accused Mr. Seneschal of possible embezzlement.[5] Mr. Wilson undertook an investigation before speaking to Mr. Lochhead, Officer Horne, or Detective Dutton. *Cf. Gen. Motors Corp. v. Piskor*, 352 A.2d 810, 816 (Md. 1976) (holding there was sufficient evidence to send the question of malice to the jury where a routine 30 minute inventory could have been conducted to determine whether the plaintiff had, in fact, stolen anything from

---

[5] As noted above, Mr. Wilson's June 13, 2007 written report to Detective Dutton did not state that he was certain Mr. Seneschal had stolen from AMB. Rather, it stated that the company's internal investigation showed that "numerous billing items were paid to the Subcontractor Mike Powell on an ongoing weekly basis from January of 2006 through February of 2007 that were not listed on the Subcontractor Mike Powell's invoices." (*See* Dutton Dep. Ex. 5 at 1.) Mr. Seneschal has not disputed the truth of this statement, nor could he. Moreover, Mr. Wilson's written report stated that after Mr. Seneschal left AMB, "*evidence came forward* of a 'kick back' type scam", and that "it *appears* that more than $60,000 was funneled through this scheme." (*Id*. at 2 (emphasis added).) Thus, the report did not claim that Mr. Seneschal definitely stole $60,000 from AMB. Instead, it described suspicious behavior based on the evidence before Mr. Wilson.

his employer). Although past work orders typically may have been retained at AMB, as has already been discussed, the work orders in question have not been found to date. There is simply nothing in the record to refute Mr. Wilson's testimony that he was unable to find the corresponding work orders during his inquiry.

Thus, in light of the investigation taken by Mr. Wilson prior to making any statements with regard to Mr. Seneschal's possible guilt, and the lack of evidence showing the specific work orders in question were, in fact, available, it cannot be inferred that the defendants acted with reckless disregard for the truth. Accordingly, the statements at issue are privileged and the defendants are entitled to summary judgment on Mr. Seneschal's defamation claim (Count II).

IV. *Loss of Consortium*

The plaintiffs concede that if their malicious prosecution and defamation claims fail, their loss of consortium claim must also fail. *See, e.g., Hines v. French*, 852 A.2d 1047, 1072 (Md. App. 2004). Because the court finds that the defendants are entitled to summary judgment on Counts I and II, they are also entitled to summary judgment on Count III.

## **CONCLUSION**

For the foregoing reasons, AMB and Mr. Wilson's motion for summary judgment will be granted. The court will also enter summary judgment in favor of the remaining defendants, and their motion to dismiss will be denied as moot.[6] A separate Order follows.

September 8, 2010            /s/
   Date            Catherine C. Blake
           United States District Judge

---

[6] Because Mr. Seneschal's theory of liability with regard to the remaining defendants would be based only on their status as members of AMB, and AMB is entitled to summary judgment, the remaining defendants' motion to dismiss is moot. As suggested by the plaintiff, I will treat their motion instead as one for summary judgment. Pltf's Mem. in Opp. at 2. Accordingly, summary judgment will be entered in favor of all defendants.